IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MYRNA ALFICH                    )
                               )
v.                             )        No. 3:14-0577
                               )
CAROLYN W. COLVIN,             )
        Acting Commissioner of )
        Social Security        )


To: The Honorable Todd J. Campbell, District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income benefits ("SSI"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g) and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 12) should be DENIED.


## I. INTRODUCTION

On September 30, 2010, the plaintiff protectively filed for SSI, alleging disability due to

bipolar disorder with an onset date of November 1, 2001.  (Tr. 12, 119-24, 129, 133.)  She later

alleged disability due to pain in her back, neck, shoulders, hips, and knees.  (Tr. 17, 37-40, 147-55,

214.)  Her application was denied initially and upon reconsideration.  (Tr. 52-58, 62-65.)  The

plaintiff testified at a hearing before Administrative Law Judge Scott Shimer ("ALJ") on August 30, 2012, and amended her alleged onset date to February 22, 2011. (Tr. 12, 29-51.) The ALJ entered an unfavorable decision on September 21, 2012 (tr. 12-24), and on December 24, 2013, the Appeals Council denied the plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. BACKGROUND

The plaintiff was born on November 2, 1959, and she was 50 years old as of her application date. (Tr. 37.) She obtained her GED and has worked as a cashier on a part-time basis. (Tr. 33-35.)

### A. Chronological Background: Procedural Developments and Medical Records

In a Function Report dated December 12, 2010 (tr. 147-55), the plaintiff reported that she did not like dealing with people, had periods of depression and crying, and was "slow" and "absent minded" with poor sleep due to "restlessness" and "nervousness." (Tr. 147-48.) She related that she took care of a disabled veteran and was able to prepare meals, pay bills, wash laundry, clean, go outside "occasionally," use public transportation, and shop. (Tr. 148-50.) She explained that she was able to perform chores around the house and yard depending on her mood, pain, and depression. (Tr. 149.) She indicated that she did not have hobbies and did not spend time with other people but that she could follow written or spoken directions. (Tr. 151-52.) In addition to her mental impairments, the plaintiff alleged that, due to back and knee pain, she could not lift more than ten pounds, squat, bend, stand longer than ten minutes, or walk more than half a block. (Tr. 152.)

The plaintiff underwent a psychological consultative examination by Dr. Mark Langgut, Ph.D, on January 12, 2011. (Tr. 178-83.) She told Dr. Langgut that she "hurt all over" and complained of depression, anxiety, poor concentration, and insomnia. (Tr. 178.) She indicated that she had received outpatient mental health treatment in the past but was not currently taking medication or pursuing therapy. (Tr. 179.) She related that she was not working because there were "no jobs[,] . . . [n]obody calls[,] . . . [and] I'm too old." *Id.* She said that she was able to cook, clean, shop, wash laundry, and "provide care for her disable[d] boyfriend." (Tr. 180.) She told Dr. Langgut that she was "basically homeless" and stayed with her boyfriend or another friend. *Id.* She said that she talked to her mother on the phone but otherwise had "minimal contact with her family." *Id.*

According to Dr. Langgut, the plaintiff described having "moderate depression with depressive symptoms of hopelessness, lethargy and sleep problems and decreased concentration" that had "become worse and more intense over the past ten years." *Id.* He described the plaintiff as "cooperative and friendly although negativistic and preoccupied" and found no evidence of delusions, obsessive ideas, phobias, or hallucinations. (Tr. 180-81.) The plaintiff demonstrated "mild ruminative ideation," and Dr. Langgut described her insight as "impaired" and noted that she "gave evidence of variable memory abilities." (Tr. 181.) He diagnosed her with dysthymic disorder; anxiety disorder, not otherwise specified ("NOS"); alcohol abuse–status unknown; and personality disorder with dependent features. (Tr. 182.) He opined that she would not be able to manage funds "[d]ue to questionable use of alcohol and significant mood dysregulation" as well as "[i]mpairments in judgment, reasoning and comprehension." (Tr. 181.)

On February 10, 2011, Dr. Terry Travis, a Disability Determination Services ("DDS") nonexamining consultative physician, completed a Psychiatric Review Technique ("PRT") and mental Residual Functional Capacity ("RFC") assessment. (Tr. 184-201.) In the PRT, Dr. Travis found that the plaintiff had dysthymic disorder; anxiety disorder, NOS; substance addiction disorder; and a personality disorder evidenced by pathological dependence, passivity, or aggressivity. (Tr. 187, 189, 191-92.) Dr. Travis opined that the plaintiff had moderate limitations in the areas of maintaining social functioning and maintaining concentration, persistence, or pace as well as mild restriction of the activities of daily living and no episodes of decompensation. (Tr. 194.)

In the mental RFC assessment, Dr. Travis opined that the plaintiff was moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) work in coordination with or proximity to others without being distracted by them; (3) interact appropriately with the general public; (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (5) respond appropriately to changes in the work setting; and (6) complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 198-99.) Dr. Travis further explained that the plaintiff:

> is cognitively intact and can learn instructions. She is able to relate appropriately but reports anxiety around others. She is able to function consistently at a reasonable rate within a schedule. She is able to adapt to circumstances. She is able to do multistep tasks in a work setting that does not involve routine interaction with others.

(Tr. 200.)

On February 22, 2011, Dr. Anand Lal completed a consultative examination of the plaintiff. (Tr. 202-12.) The plaintiff reported having a history of bipolar disorder and difficulty sleeping and said that, although she had taken medication in the past, she was unable to afford it and had not taken

medication in the past four years.  (Tr. 202.)  She also reported having pain in her low back, neck, shoulders, right knee, and right foot.  (Tr. 202-03.)  Upon physical examination, the plaintiff demonstrated decreased range of motion in her cervical spine, bilateral shoulders, lumbar spine, and bilateral knees as well as a positive straight leg raise test.  (Tr. 205-09.)  Her handgrip strength was 3-4 out of 5 bilaterally with normal fine and gross manipulation.  (Tr. 209-10.)  Dr. Lal observed that the plaintiff ambulated with a normal gait, did not use an assistive walking device, did not have difficulty getting on and off the exam table, and was able to perform the tandem, heel, and toe walks without difficulty.  *Id.*  However, she had moderate difficulty squatting and rising and was unable to hop on either leg.  (Tr. 210-11.)  She had no focal deficits and intact nerves, reflexes, and sensation.  (Tr. 211.)  A mental status examination showed no apparent cognitive difficulties with normal speech and affect and "no signs of depression or anxiety."  *Id.*  Dr. Lal diagnosed her with a history of bipolar disorder, chronic low back pain, status post low back surgery, right lumbar radiculopathy, osteoarthritis of the right knee, and cervical osteoarthritis.  *Id.*  He opined that she would be able to manage funds if granted disability benefits.  *Id.*

On March 2, 2011, Dr. Reynaldo Gotanco, a DDS nonexamining consultative physician, reviewed the results of Dr. Lal's consultative examination and completed a physical RFC assessment.  (Tr. 213-20.)  Dr. Gotanco opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk about six hours and sit about six hours in an eight hour workday, push and/or pull in unlimited amounts, and occasionally climb, kneel, crouch, and crawl.  (Tr. 214-15.)

The plaintiff received primary care treatment at West Wilson Family Practice from July 2011 until May 2012.[1] (Tr. 225-34.) During this time she was treated for chronic back pain, depression, and anxiety. *Id.* In July 2011, she reported experiencing depression over the recent, sudden death of her fiancé. (Tr. 231.) She also received treatment in April and May 2012 at the Charis Health Center for nausea, vomiting, constipation, and abdominal pain shooting into her chest. (Tr. 235-37.) She was diagnosed with gastritis and anxiety and treated with Nexium and Phenergan. *Id.*

From August 2011 until June 2012, the plaintiff received psychiatric treatment at Cumberland Mental Health Center ("Cumberland")[2] primarily under the care of Terre Ament, an advanced practice nurse. (Tr. 238-80.) At her intake interview, the plaintiff reported that she experienced "nervousness, poor sleep, depression, pain/aches, low motivation, mood swings," and "long periods of months when she had decreased need for sleep with increased energy, racing thoughts, goal directed behavior, and irritability." (Tr. 240-41.) She said that, before her fiancé died in May, she was "finally happy" and enjoyed playing games on the computer, taking walks, going to the movies, and dancing. (Tr. 242.) A mental status examination showed that she was anxious with pressured speech and a dysthymic mood but was otherwise normal. (Tr. 246-47.) Ms. Ament diagnosed her with bipolar I disorder, most recent episode mixed, severe with psychotic features, and assigned her a Global Assessment of Functioning ("GAF") score of 45.[3] (Tr. 249-50.)

---

[1] The Court made every attempt to decipher the medical evidence of record; however, some of the treatment notes from West Wilson Family Practice are illegible.

[2] Cumberland is part of the Volunteer Behavioral Health Care System.

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV–TR"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,

During her course of treatment with Ms. Ament, the plaintiff continued to complain of depression, mood swings, irritability, and poor sleep. (Tr. 252, 257, 261, 265, 270.) During mental status examinations, the plaintiff occasionally presented with a flat or irritable affect and/or a dysthymic mood but otherwise had an appropriate affect, appropriate appearance, normal speech, normal thought content, organized thought process, and normal memory. (Tr. 252-53, 257-58, 261-62, 265-66, 270-71.) Ms. Ament prescribed a number of different medications to treat depression, anxiety, and poor sleep, including Xanax, Seroquel, Neurontin, Viibryd, Prozac, Trileptal, Ambien, and Geodon. (Tr. 250-51, 255, 258, 262, 266, 271.) When the plaintiff overused Xanax and ran out on one occasion, Ms. Ament discontinued it and refused to prescribe it again despite the plaintiff's requests. (Tr. 252, 265.)

On August 20, 2012, Ms. Ament completed a "Physician/Nurse Practitioner Statement" in which she indicated that the plaintiff's current diagnosis was bipolar I disorder, severe with psychotic features, and that she was being treated with Geodon, Prozac, Neurontin, and Ambien. (Tr. 281.) Ms. Ament opined that the plaintiff was not capable of maintaining employment but was capable of managing her own funds and living alone and/or without supervision. *Id.*

### B. Hearing Testimony

At the hearing on August 30, 2012, the plaintiff was represented by counsel, and the plaintiff and the vocational expert ("VE"), Pedro Roman, testified. (Tr. 29-51.) The plaintiff testified that she has a GED, lives alone, and has worked at several jobs as a cashier on a part-time basis. (Tr. 33-

occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

36.)  She said that she was fired from her last cashier job after a "couple of weeks" because her employer said "that [she] couldn't multitask well enough."  (Tr. 33-34, 42-43.)

The plaintiff testified that she has mood swings, panic attacks, feelings of worthlessness, racing thoughts, and problems concentrating.  (Tr. 40-43.)  She testified that she has mood swings "every day" and that she "[does not] like being around a lot of people."  (Tr. 40, 42.)  She said that her medication "doesn't really work" and that, on a "bad day," she does not get out of bed.  (Tr. 40, 43.)  She said that she also has "chronic back problems," including having had microdiscectomy surgery in the 1990's, and described her back pain as "constant" and "[m]inor to severe" with "[b]ad shooting pains up and down" her back and right leg.  (Tr. 37.)  She explained that her hips and knees are "real bad" and that it hurts to turn her back, raise her arms over her head, or lift heavy objects such as a gallon of milk.  (Tr. 38.)  She explained that she uses over the counter pain medication and takes hot baths to relieve her pain.  (Tr. 38-39.)  She estimated that she is able to sit 10-15 minutes or stand ten minutes at a time and cannot walk a city block without experiencing shortness of breath. (Tr. 40.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles and determined that none of the plaintiff's previous jobs qualified as past relevant work.  (Tr. 47, 49.)  The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and lack of past relevant work experience would be able to obtain work if she was restricted to no more than light exertional level work; could occasionally balance, stoop, kneel, crouch, and crawl; could occasionally climb ramps and stairs but could not climb ladders, ropes, or scaffolding; could occasionally come in contact with the general public; and could perform "simple, routine, repetitive-type tasks and maybe some lower-level detail tasks but not complex tasks."  (Tr. 47.)  The VE

replied that a person with these limitations could work as a pricing tagger, inspector/hand packager, and small parts assembler. (Tr. 47-48.) The VE testified that these jobs would permit an average of ten absences per year and would not be available to a person who had trouble concentrating to the extent that she would be off task 10-20% of the workday. (Tr. 48.) In response to questioning from the plaintiff's attorney, the VE testified that a person who was unable to understand, remember, and carry out simple instructions on a sustained basis would be unable to perform any job. (Tr. 49.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on September 21, 2012. (Tr. 12-24.) Based upon the record, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since September 30, 2010, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: bipolar disorder; osteoarthritis right knee; remote history of lumbar spine surgery with complaints of lower back pain; cervical spine osteoarthritis; anxiety; and personality disorder (20 CFR 416.920©).

        ***
3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

        ***
4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he [*sic*] can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; cannot climb ladders/ropes/scaffolds; can have occasional contact with the public; and can understand, remember, and carry out simple, routine, repetitive tasks but not complex tasks.
        ***

9

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on November 2, 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

                                        ***

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 30, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-24.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial

evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of*

*Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. §423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See*

*Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent

of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "bipolar disorder; osteoarthritis right knee; remote history of lumbar spine surgery with complaints of lower back pain; cervical spine osteoarthritis; anxiety; and personality disorder." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.) At step four, the ALJ determined that the plaintiff had no past relevant work. (Tr. 22.) At step five, the ALJ determined that the plaintiff was capable of performing work as a price tagger, inspector/hand packager, and small parts assembler. (Tr. 23-24.)

**C. The Plaintiff's Assertions of Error**

The plaintiff argues that the ALJ erred by: (1) failing to perform a function-by-function analysis of her limitations; and (2) failing to properly evaluate the opinion of nurse practitioner Ament. Docket Entry No. 12-1, at 8-15.

**1. The ALJ properly performed a function-by-function assessment of the plaintiff's limitations and did not err in formulating her RFC.**

The plaintiff argues that the ALJ failed to perform a function-by-function assessment of her limitations when determining her RFC as required by Social Security Ruling ("SSR") 96-8p. Docket Entry No. 12-1, at 8-11. Specifically, the plaintiff contends that the ALJ failed to properly address certain mental limitations related to interacting appropriately with supervisors and coworkers, adapting, and completing a workday and workweek without interruptions from psychologically based symptoms as well as certain physical limitations including using her upper extremities for pushing, pulling, and reaching. *Id.*

SSR 96-8p provides that an "RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," and that "[e]ach function must be considered separately." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *3, 5. The Sixth Circuit has held that "[a]lthough SSR 96-8p requires a function-by-function evaluation to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 547 (6th Cir. Mar. 4, 2002) (internal citations and quotation marks omitted). Additionally, "[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a

detailed statement in writing" because there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Id.* (internal citations and quotation marks omitted). Consequently, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.* (internal citations and quotation marks omitted).

In this case, the ALJ discussed in great detail the plaintiff's allegations regarding her limitations as well as her treatment history and each of the medical opinions in the record. (Tr. 15-22.) Although the ALJ did not make a specific finding regarding every possible limitation to be gleaned from the record, he comprehensively assessed the plaintiff's limitations and included those limitations that he found supported by the record and excluded those that he found unsupported by the record. Indeed, the ALJ's written decision shows that he appropriately considered all of the plaintiff's impairments, including those that he did not include in the plaintiff's RFC.

For example, the plaintiff argues that the ALJ failed to properly consider her ability to use her upper extremities to push, pull, and reach. Docket Entry No. 12-1, at 10-11. As support for these limitations, the plaintiff refers to Dr. Lal's physical examination findings in which she demonstrated 3-4 out of 5 handgrip strength bilaterally and decreased range of motion in the cervical spine, lumbar spine, bilateral shoulders, and bilateral knees. (Tr. 205-09.) However, contrary to the plaintiff's assertion that the ALJ did not address these exam findings, the ALJ in fact discussed these particular findings as well as other findings made by Dr. Lal during the examination. (Tr. 18.) For example, the ALJ also observed that the plaintiff demonstrated "no limitations in fine or gross

manipulation," had no focal deficits and normal sensation, could get on and off the exam table without difficulty, and could perform the tandem, heel, and toe walks. *Id.*

Importantly, despite the findings from this examination, Dr. Lal did not offer an opinion regarding the plaintiff's functional limitations. When Dr. Gotanco reviewed Dr. Lal's examination and completed a physical RFC assessment, he found no limitations regarding the plaintiff's ability to operate hand or foot controls, push, pull, reach, handle, finger, or feel. (Tr. 214-18.) The ALJ found that Dr. Gotanco's report was consistent with Dr. Lal's examination findings and gave it significant weight. (Tr. 20.) In the plaintiff's RFC, the ALJ limited the plaintiff to light work with some additional postural limitations. Although the ALJ did not make specific findings regarding certain alleged limitations, the ALJ's thorough discussion of the medical evidence from Drs. Lal and Gotanco shows that he appropriately considered their findings in determining the plaintiff's RFC.

Similarly, the plaintiff argues that the ALJ did not address certain specific mental limitations, including her ability to interact with coworkers and supervisors, adapt to changes in the work setting, and complete a normal workday and workweek without interruptions from psychologically based symptoms. Docket Entry No. 12-1, at 9. Again, contrary to the plaintiff's assertion, the ALJ specifically considered these exact limitations when assessing Dr. Travis' PRT and mental RFC assessment. (Tr. 20-21, 184-201.) However, relying on Dr. Travis' opinion, the ALJ found that:

> Despite these limitations, the consultants found that the claimant is cognitively intact and can learn instructions. She can relate appropriately but reports anxiety around others. She can function consistently at a reasonable rate within a schedule. She can adapt to circumstances [and] do multistep tasks in a work setting that does not involve routine interaction with others.

(Tr. 21.) In addition, the ALJ discussed in significant detail the plaintiff's mental health treatment history, including her medication noncompliance and relatively benign mental status examinations,

her "wide range of daily activities," her reports that she was able to "follow written and spoken instructions," and her mother's reports that she "had no problems getting along with family, friends, neighbors, and authority figures." (Tr. 21-22.) After considering all of the evidence related to the plaintiff's alleged mental impairments, the ALJ concluded that she could have only occasional contact with the public and could "understand, remember, and carry out simple, routine, repetitive tasks but not complex tasks." (Tr. 16.)

The plaintiff contends that the ALJ should have included certain limitations in her RFC; however, it was the ALJ's prerogative to include only those limitations that he found to be credible and well supported by the record. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). The ALJ fully considered all of the relevant evidence in accordance with SSR 96-8p and appropriately explained his decision to include or not include certain limitations in the plaintiff's RFC.

### 2. The ALJ properly considered the opinion of nurse practitioner Ament.

The plaintiff argues that the ALJ failed to properly evaluate the opinion of nurse practitioner Ament. Docket Entry No. 12-1, at 11-15.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician,

psychologist, or other acceptable medical source[4] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[5] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the

---

[4] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

[5] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

treating physician rule.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc.

Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled

to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .'*"

*Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL

374188, at *4) (emphasis in original).  The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship; (3) the supportability of the opinion
> with respect to relevant evidence such as medical signs and laboratory findings;
> (4) the consistency of the opinion with the record as a whole; (5) the specialization
> of the physician rendering the opinion; and (6) any other factor raised by the
> applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R.

§ 404.1527(c)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to

the treating source.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R.

§§ 404.1527(c)(2); 416.927(c)(2)).  The "good reasons" must be "sufficiently specific to make clear

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight."  *Id.*  If an ALJ fails to adhere to this procedural requirement, the

case should be remanded for further clarification.[6]  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

544-45 (6th Cir. 2004).

---

[6] The rationale for the "good reasons" requirement is to provide the claimant with a better
understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly
applied the treating physician rule.  *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128,
134 (2d Cir. 1999)).

Under the Regulations, nurse practitioners are not classified as acceptable medical sources but as "other sources." 20 C.F.R. § 416.913(d). SSR 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p clarified the treatment of "other sources" by explaining that:

> [a]lthough the factors in 20 CFR 404.1527(c) and 416.927(c) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;
>
> • How well the source explains the opinion;
>
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
>
> • Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5. *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

The plaintiff visited Ms. Ament, an advanced practice nurse, for mental health treatment from approximately August 2011 to June 2012. (Tr. 238-80.) During this time, Ms. Ament diagnosed the plaintiff with bipolar I disorder, severe with psychotic features; assigned her a GAF score of 45; and prescribed a number of different medications. *Id.* In a Physician/Nurse Practitioner Statement on August 20, 2012, Ms. Ament summarized her treatment of the plaintiff and opined that the plaintiff was not capable of maintaining employment but was capable of managing funds and living independently. (Tr. 281.)

After summarizing the plaintiff's treatment history with Ms. Ament in significant detail (tr. 18-19), as well as her opinion that the plaintiff was unable to perform any job, the ALJ noted that:

> Nurse Ament has treated the claimant only for mental health issues. In addition, this assessment provides no specific limitations; it simply draws a conclusion that the claimant cannot work, which is an issue reserved to the Commissioner (20 CFR 416.927). Furthermore, the objective medical evidence discussed above is inconsistent with a complete inability to work.

(Tr. 20.) Later, the ALJ again discussed Ms. Ament's opinion, finding that it was "internally inconsistent," because, while Ms. Ament found that the plaintiff could not maintain employment, she also "deemed [her] capable of managing [her] own funds and living alone without supervision." (Tr. 21.) The ALJ also found that "the objective medical evidence fails to support [Ms. Ament's] assessment." *Id.*

The Court concludes that the ALJ appropriately considered the evidence from Ms. Ament. Nurse practitioners are not an acceptable medical source as that term is defined in the Regulations, and only acceptable medical sources can give medical opinions. *See* 20 C.F.R. §§ 416.913(a),(d); 416.927(a)(2). Consequently, the ALJ was not required to give Ms. Ament's opinion controlling weight as if she were a treating source, and the ALJ only needed to consider her opinion in light of the factors outlined in SSR 06-03p. *See* 2006 WL 2329939, at *4-5. *See also Roberts*, 2009 WL 1651523, at *7-8.

The plaintiff finds fault with some of the reasons that the ALJ gave for not crediting Ms. Ament's opinion. Docket Entry No. 12-1, at 14-15. For example, the plaintiff argues that the ALJ improperly discredited Ms. Ament's opinion because she "treated [her] only for mental health issues." *Id.* at 14. The plaintiff also argues that it was not inconsistent, as the ALJ suggested, for

Ms. Ament to opine that the plaintiff was unable to work but was able to manage funds and live alone. *Id.* The Court generally agrees with the plaintiff that these reasons, standing alone, do not provide a particularly well-reasoned foundation for discrediting Ms. Ament's opinion. The fact that Ms. Ament only treated the plaintiff for mental health issues does not prevent her from providing a valuable opinion regarding the plaintiff's ability to work, at least from a mental standpoint. A person may be unable to work exclusively due to mental limitations. Likewise, the Court fails to see the inherent inconsistency in Ms. Ament's opinion that, although the plaintiff cannot work, she can manage her own funds and live alone. Further explanation by the ALJ as to why he viewed these functions as incompatible with each other would have been helpful.

However, even allowing that these reasons are not particularly well founded or well explained, the Court still concludes that the ALJ gave Ms. Ament's opinion sufficient consideration. Most importantly, as the ALJ observed, Ms. Ament did not provide an opinion regarding the plaintiff's specific functional limitations but simply concluded that she was unable to work. (Tr. 20, 281.) The ALJ, however, is not required to accept such a conclusion on the "ultimate issue of disability." *Maple v. Apfel*, 14 Fed. Appx. 525, 536 (6th Cir. July 12, 2001). *See also* 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). This reason alone provides sufficient support for the ALJ's decision not to accept Ms. Ament's opinion. The ALJ also found that the "objective medical evidence fails to support" Ms. Ament's opinion and provided a lengthy discussion of the plaintiff's "situational issues," which, in the ALJ's view exacerbated her mental health limitations; her noncompliance with medication; her activities of daily living; and her relatively normal mental status examinations as support for his conclusion that the plaintiff is able

24

to work despite Ms. Ament's opinion to the contrary.  (Tr. 21-22.)  Given the ALJ's thorough consideration of Ms. Ament's opinion, the Court concludes that the ALJ appropriately considered her opinion in light of the factors outlined in SSR 06-03p and provided a satisfactory explanation for his decision not to accept Ms. Ament's opinion that the plaintiff is unable to work.

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge